UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SANDRA GARDNER WOMACK, ] | |
| ] | |
| Plaintiff(s), ] | |
| ] | |
| vs. ] | CV-95-N-2001-S |
| ] | |
| JACQUELINE M. FELDMAN; ] | |
| ROBERT SAVAGE; CONNIE ] | |
| BUCHANAN; and PAMELA ] | |
| McFERRIN, ] | |
| ] | |
| Defendant(s). ] | |

**Memorandum of Opinion**

**I.   Introduction.**

Plaintiff Sandra Gardner Womack brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendants, all personnel at the University of Alabama Smolian Clinic (the "Clinic"), discriminated against her on the basis of her race in the manner and means by which they provided her with mental health care. The individual defendants are Dr. Jacqueline M. Feldman, Dr. Robert Savage, Dr. Connie Buchanan, and Pamela McFerrin, a psychiatric therapist. They are sued in their individual capacities only.

The court presently has for consideration the defendants' motion for summary judgment and their motion to strike affidavits filed by the plaintiff in opposition to summary judgment. The parties have been heard by brief and the motions are ripe for decision. Upon due consideration, the motion for summary judgment will be granted and the action will be dismissed. The motion to strike is rendered moot.

## II. The Undisputed Facts.[1]

The Clinic is a part of the University of Alabama at Birmingham which provides mental health services to individuals who live in a specified geographic region in and around the Birmingham, Alabama area.[2] In 1993, Sandra Womack's treating psychiatrist referred her to the Clinic for treatment because she was having transportation problems and the Clinic was closer to the plaintiff's home. At the time of her referral, Ms. Womack was being treated for depression, and during the course of this treatment, she was taking several prescribed medications including Mellaril, Prozac, Elavil and Ativan.

The plaintiff's initial access interview occurred around February 18, 1993. Dr. Connie Buchanin, a psychiatrist at the clinic, first saw the plaintiff on April 29, 1993. Patricia Estelle, a friend of the plaintiff, was responsible for driving the plaintiff to these appointments and was present the day Dr. Buchanan first met with Ms. Womack. There are no details of what occurred at this meeting. The plaintiff was scheduled to return to the clinic on June 1, 1993.

The June 1 meeting was conducted by an interdisciplinary group of doctors--a so-called "evaluation clinic." While it is unclear the exact format or purpose of this clinic, it is undisputed that during this evaluation Ms. Womack was asked several questions about

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] The University of Alabama at Birmingham is a part of the University of Alabama System, which also includes the University of Alabama, located in Tuscaloosa, and the University of Alabama in Huntsville. Collectively, the University of Alabama System is operated and governed by The Board of Trustees of the University of Alabama, a corporate body created by state statute.

2

one or more lawsuits she then had pending which caused her to become extremely upset. Although the record is not entirely clear, it is apparent that this evaluation clinic was moderated or run by Dr. Jackie Feldman, the Executive Director of Smolian Clinic at the time. *Felman Deposition*, at 7. After Ms. Womack became upset, Ms. Estelle confronted Dr. Feldman as to why the plaintiff had been asked questions about her other pending lawsuits.

The plaintiff's next appointment was scheduled for July 22, 1993, but there is no record as to what treatment Ms. Womack received on that occasion.

After Ms. Womack began experiencing difficulty sleeping, Ms. Estelle called Dr. Buchanan on July 27, 1993, and requested that she see the plaintiff the next day. She did so and changed her medication to allow her to sleep.

Ms. Womack returned to the Smolian clinic on August 5, 1993, to see Dr. Robert Savage, a clinical psychologist at the clinic. The purpose of this visit was to perform testing on the plaintiff. Ms. Estelle drove the plaintiff to her appointment. Following closely behind in her own car was Ms. Amelia Williams Hunter, another friend of the plaintiff. When they arrived, both Ms. Hunter and Ms. Estelle confronted Dr. Savage and insisted that Ms. Womack was too ill to undergo the scheduled testing. However, they allowed the plaintiff to be tested anyway.

After the tests were complete Dr. Savage noted that the plaintiff had "malingered" and that she "was minimally cooperative." *Psychological Test Results Notes of August 5, 1993*. On September 30, 1993, Ms. Estelle and Ms. Womack met with Dr. Savage to discuss

this report. At this meeting, Ms. Estelle accused Dr. Savage of treating Ms. Womack poorly because she was black.

On August 26, 1993, the plaintiff had a group therapy session at Smolian clinic. Ms. Estelle drove the plaintiff to that session which was conducted by Pamela McFerrin, a psychiatric social worker.

On January 27, 1994, Ms. Womack again went to the Smolian Clinic for an appointment with Dr. Buchanan. After an initial evaluation by a student doctor, Ms. Womack contends she waited, in pain, for hours while non-black individuals, who had arrived after her, were seen before her. After Dr. Buchanan had seen the plaintiff, Ms. Womack insists that Dr. Savage followed her and her niece into the elevator and down to the basement.

On June 7, 1994, the plaintiff's family removed her from the care of Smolian Clinic.

### III.    Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The

4

movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's

function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

6

## IV. Discussion

### A. Evidentiary Submissions

The defendants contend the plaintiff has failed to make out a prima facie case of intentional discrimination. Section 1983 requires proof of discriminatory intent. *Lee v. Washington County Board of Education*, 625 F.2d 1235 (5th Cir. 1980).[3] Because Ms. Womack is proceeding *pro se*, the court has not held tightly to the procedural standards applicable to trained lawyers and, instead, has examined the evidence with a view toward determining if the plaintiff can create a triable issue of fact regarding whether she has established a prima facie case of race discrimination. The court is satisfied that she cannot.

Ms. Womack has included among her submissions the affidavit of Odessa Maxwell Gardner. Ms. Gardner is apparently related to Ms. Womack, although she does not say how. Ms. Gardner states in her affidavit:

10. That Sandra Gardner Womack, suffered great antagonism and added stress while she was a patient under the care of the defendants.

11. That Sandra Gardner Womack was a victum [sic] of bias attitudes and treatment while under the care of the defendants.

12. That the attempt of Sandra Gardner Womack's family to intervene and stop the prejudice actions of the defendants was futile.

*Affidavit of Odessa Maxwell Gardner*, at 2. Nowhere in Ms. Gardner's affidavit does she reveal how the defendants discriminated against the plaintiff. Indeed, the affidavit does not state that Ms. Gardner witnessed any alleged acts of discrimination. At most, Ms.

---

[3] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (1981) (en banc).

7

Gardner's affidavit amounts to nothing more than mere conclusory allegations of discrimination.

Ms. Womack also offers the affidavit of Adraon G. Townsend. Like Ms. Gardner's affidavit, this affidavit does not in any way describe who Ms. Townsend is or indicate that she has personal knowledge of discriminatory acts directed at Ms. Womack by any of the defendants.[4] Instead, the affidavit merely recounts the contents of correspondence between Ms. Townsend and the defendants. The court has reviewed the affidavit and the letters it refers to, which were also included as part of the plaintiff's submission. However, the plaintiff has not cited, nor has the court found, any portion of the affidavit, nor any of the letters in question, which can reasonably be said to evidence discrimination. Neither the letters nor the affidavit aver that Ms. Townsend ever witnessed any alleged acts of discrimination. Ms. Townsend's letters consist only of many questions and complaints to the recipients about how she heard her sister was treated. In short, Ms. Townsend is not a fact witness, so neither her affidavit nor her letters are probative of intentional discrimination.

The affidavit of Dr. Richard C. Dale, apparently a medical doctor who is not a psychiatrist, states that he has treated Ms. Womack for various physical ailments since 1990. Dr. Dale does no more than relate his treatment of the plaintiff and state his opinion that some of the diagnostic procedures and treatments at the Clinic were inappropriate. The affidavit adds nothing to the plaintiff's case because its demonstrates no personal

---

[4] Later memos from Dr. Feldman indicate that Ms. Townsend is Ms. Womack's sister.

knowledge of what took place at the Clinic during the plaintiff's treatment there; Dr. Dale is not a trained psychiatrist; and, he states no basis for any "expert" opinion that he might be qualified to give.[5]

The plaintiff presents the affidavits of Tori L. Colvin, Amelia Williams Hunter, and Patricia Phillips Estelle, three individuals who do seem to have first hand knowledge of events at Smolian clinic which concern the plaintiff. To the extent they relate conduct relevant to the plaintiff's claims and demonstrate the affiants' personal knowledge, the court will reproduce them here.

Ms. Colvin recounts that she accompanied the plaintiff to Smolian Clinic for a scheduled appointment with Dr. Buchanan on January 27, 1994. *Colvin Affidavit*, at 1. After the plaintiff was seen by a medical student, Ms. Colvin testifies that Ms. Womack was sent to the waiting area where she waited for hours, "while those of other races, which (sic) had come to the clinic after the plaintiff, and who were not in such pain and white were being called by Dr. Buchanan." *Id.* at 2. She also states that "when [she] and the plaintiff . . . came out of Dr. Buchanan's office; [sic] Dr. Savage was standing out in the lobby, and he was just standing there watching them." *Id.* at 3. She states that when she and the plaintiff entered the elevator, "Dr. Savage followed them onto it." *Id.* Ms. Colvin insists that they "would not have thought anything about Dr. Savage, had he gotten off on a floor, however, he stayed on the elevator when [they] got off on the basement floor." *Id.* at 3-4.

---

[5] Dr. Dale's proffered affidavit offers little of value. If he purports to offer "expert" testimony, he fails to demonstrate that he possesses the requisite qualifications to comment on the plaintiff's treatment or, if he does, that he has examined the appropriate record of such treatment with a view toward rendering an expert opinion. Moreover, the plaintiff did not, during discovery, identify Dr. Dale as an expert witness.

9

The plaintiff next offers the affidavit of Amelia Williams Hunter. Ms. Hunter states that she overheard a telephone conversation between Ms. Patricia Phillips Estelle and Dr. Savage. According to her, Ms. Estelle asked Dr. Savage to allow the plaintiff to reschedule her August 5, 1993, appointment because the plaintiff "was ill and had not gotten her glasses at that point." *Hunter affidavit*, at 1. She says Dr. Savage refused to allow the plaintiff to reschedule her appointment explaining that "this was a court order" and "if [the plaintiff] was not brought to the clinic on that day she would be placed in jail, for disobeying a direct court order." *Id.* at 2. She recounts that she followed Ms. Estelle in her own car as Ms. Estelle drove Ms. Womack to her appointment with Dr. Savage later that day. *Id.* She says that upon arriving at the clinic they asked Dr. Savage once again if they could reschedule Ms. Womack's appointment and he said "this is a court order, but you can take her home if you want to risk them (the court) putting her in jail." *Id.* She also testified that there were "investigators" at the clinic the day Ms. Womack saw Dr. Savage. *Id.* at 4.

In her affidavit, Patricia Phillips Estelle testifies that she "was the main person reponsible [sic] for transporting the plaintiff . . . to and from the Smolian Clinic." *Estelle affidavit*, at 1. She testifies that she was present when Ms. Womack was seen by Dr. Buchanan on April 29, 1993. *Id.* When setting up Ms. Womack's appointments, Ms. Estelle complains that she "was only asked questions about the plaintiff, Sandra Gardner Womack's then ongoing lawsuits between the company which made the chemicals which exploded in the plaintiff's face, and the workmens [sic] compensation lawsuit by Dr. Connie Buchanan." *Id.* at 1-2. The affidavit then states that Ms. Womack was next

10

scheduled for an appointment on June 1, 1993, with Dr. Buchanan. *Id.* at 2. Although Ms. Estelle contends that neither she nor Ms. Womack was ever notified about an "evaluation clinic," she contends that the plaintiff was subjected to a "surprise clinic." *Id.* Ms. Estelle does not indicate the source of her knowledge regarding the "evaluation clinic" or what occurred there. She does testify that after this clinic "Dr. Jacqueline Feldman told her . . . that this was done because [Ms. Womack] was involve [sic] in several lawsuit [sic], so they (the doctors and staff) had just decided to have several doctors and the therapist to question her . . . on that day." *Id.* at 3. Ms. Estelle testifies that Ms. Womack was then scheduled for another appointment with Dr. Buchanan on July 22, 1993. *Id.*

According to her testimony, Ms. Estelle accompanied Ms. Womack to her July 22, 1993, appointment. *Id.* At that time Ms. Estelle says that she accused Dr. Buchanan of being biased against Ms. Womack and of discriminating against her. She states that she asked her the purpose of Ms. Womack's treatment plan. *Id.* According to Ms. Estelle, the plaintiff again saw Dr. Buchanan on July 28, 1993.

Ms. Estelle recounts almost exactly the testimony of Ms. Hunter with regards to the events of August 5, 1993. Ms. Estelle testifies that she requested that Ms. Womack's appointment with Dr. Savage be rescheduled and he refused. *Id.* at 6-7. She also states that there were investigators at the office the day Ms. Womack went in for her appointment. *Id.* at 9. She testifies that she was told by Ms. Hunter that Dr. Savage had written a report in Ms. Womack's file that the plaintiff had "malingered" during a test and "had not been fully cooperative." *Id.* at 10. Her affidavit next mentions that she and the plaintiff met with

11

Dr. Savage to discuss his report. *Id.* At this meeting, Ms. Estelle says she accused Dr. Savage of treating Ms. Womack poorly because she was black. *Id.* at 12.

Ms. Estelle contends that the plaintiff was never seen on a "first come first serve basis" and that she always had an appointment. *Id.* at 14. She also testifies that, at an August 26, 1993, appointment, she "overheard" Ms. McFerrin "questioning the plaintiff about her lawsuits, and noticed that these were questions that the plaintiff . . . did not know the answers too." [sic] *Id.* at 14-15. She testifies that at an October 21, 1993, appointment these questions became "harsh" and "loud" and that Ms. McFerrin "then told [the plaintiff] that she should know the details, and that when she comes back to group she better be able to tell them what had happened." *Id.* at 15.

At the close of Ms. Estelle's affidavit is the following paragraph:

That she, Patricia Phillips Estelle, had surely assumed that once the cases were over, that the people in charge of Sandra Gardner Womack's care would stop treating her biasly and began [sic] giving her the proper treatment, as she (Patricia Phillips Estelle) had observed them giving to their other patients of the white race.

*Id.* at 16.

In addition to the above affidavits, the plaintiff provides individual and various pages of depositions without identifying the individuals being deposed. Whole pages are missing from some of the depositions, and the submission seems to randomly change from one deposition to the other without explanation. Although there are portions of the pages which are highlighted, none of the segments of the depositions seem to demonstrate racial animus or prove intentional discrimination.

12

**B.   Dr. Feldman**

The plaintiff insists that Dr. Feldman discriminated against her when "she allowed for a surveilance [sic] team to prepare for before [sic] the arrival of the plaintiff and film the plaintiff when she arrived at the clinic for her scheduled appointments." *Amended Complaint of April 17, 1996 (hereinafter Amended Complaint)*, at 2. She also alleges Dr. Feldman failed to acknowledge and respond to her first written request for release of records, that she failed to maintain in the plaintiff's file the first written release form, and that she failed to respond to the releases. *Id.* Lastly, the plaintiff complains of the June 1, 1993, interview the plaintiff had with five other doctors at Smolian Clinic. *Id.* She contends none of these things occurred with respect to white patients at the clinic.

As shown above, the plaintiff is charged with establishing a prima facie case of discrimination with respect to Dr. Feldman. Ms. Hunter and Ms. Estelle state that there were investigators at the clinic on August 5, 1993. However, the plaintiff has presented no evidence as to what purpose the investigators served, or even if they were there to specifically investigate the plaintiff. There is also no evidence that Dr. Feldman was in any way responsible for the investigators being present at Ms. Womack's appointment, and there is no evidence indicating that the presence of the investigators amounted to intentional discrimination.

The plaintiff has pointed to no evidence of discrimination in record keeping, acknowledgments, and responses as she claimed in her amended complaint. In addition, she offers no evidence that members of other races were not subject to the types of initial interviews Dr. Feldman had with the plaintiff on June 1, 1993. Dr. Feldman has testified:

13

> Q. At the June 1st, 1993 interdiscipline evaluation, was Ms. Womack singled out to have that particular type of evaluation?
>
> A. No, sir. Let me describe that process. People call in through what's call access, which is our front line phone screen for the whole department, not just for our clinic. And we filled up our evaluation clinic just on a first-come-first-served basis. And if that Tuesday afternoon clinic was open, then three people were slotted for that. So Ms. Womack was not singled out for inclusion in that clinic.

*Feldman Deposition*, at 33. Because there is no evidence that Dr. Feldman intentionally discriminated against the plaintiff, Ms. Womack cannot make out a case against her. Therefore, Dr. Feldman is entitled to judgment as a matter of law.

### C. Dr. Savage

In ten paragraphs of her Amended Complaint, the plaintiff complains of various alleged discriminatory conduct by Dr. Savage, including: 1) forcing the plaintiff to appear for scheduled testing when she was ill; 2) refusing to document the plaintiff's illness while she took the test; 3) falsely telling the plaintiff that the tests were called for because of a court order; 4) falsely stating in the medical records that he had given the tests; 5) reporting in medical records that the plaintiff had "malingered" her symptoms; 6) forcing the plaintiff to be tested on a day when a surveillance team was there; 7) failing to correct the plaintiff's medical records; 8) failing to allow the plaintiff to adequately complete a release form; 9) maintaining an abusive tone with the plaintiff and her family members; 10) failing to follow the instructions and the procedures Dr. Buchanan recommended; 11) failing to follow various Alabama State guidelines propagated by the Alabama Department of Mental Health; 12) following the plaintiff and her niece into the Elevator after the

14

plaintiff's appointment with Dr. Buchanan on January 27, 1994; and 13) releasing the plaintiff's records without a proper release form. *Amended Complaint*, at 2-5.

The evidence offered by the plaintiff as to Dr. Savage concerns *only* the plaintiff's attempt to reschedule her appointment, the alleged "elevator incident," and the investigators at the clinic the day Ms. Womack had an appointment with Dr. Savage. The plaintiff therefore cannot make out a prima facie case against Dr. Savage on any other claim. As to the incidents for which she does offer evidence, in neither the affidavits nor the deposition testimony is there *any* evidence that Dr. Savage took the actions of which the plaintiff complains because of any racial animus. While the record is replete with allegations of discrimination made mostly by the plaintiff's relatives and friends, there is no specific evidence that persons of other races were treated better than was Ms. Womack. The incidents when the plaintiff was required to wait for treatment are typical of those present at virtually every public health care clinic. Accordingly, the plaintiff has not established a prima facie case of intentional discrimination by Dr. Savage. He is therefore entitled to judgment as a matter of law.

**D.     Dr. Buchanan**

Dr. Buchanan is accused of discriminating against the plaintiff by: 1) not providing the plaintiff with her medical records upon request; 2) changing the plaintiff's diagnosis without further consultation; 3) demonstrating an abrupt and short manner with the plaintiff; 4) treating the plaintiff negatively in therapy sessions; 5) giving out privileged information regarding the plaintiff without her consent; 6) purposefully setting appointments for the plaintiff when a surveillance team would be at the clinic; and 7) forcing the plaintiff to wait

15

for hours while patients of other races were seen and treated before her. *Amended Complaint*, at 5-6.

The *only* evidence presented as to Dr. Buchanan concerns Ms. Womack's wait at her January 27, 1994, appointment. Accordingly, the plaintiff cannot establish a prima facie case of discrimination for the remainder of her allegations. Concerning the plaintiff's January 27 appointment, Ms. Colvin testified that she was present at that appointment and that they waited for hours, "while those of other races, which had come to the clinic after the plaintiff, and who were not in such pain and white were being called by Buchanan." *Colvin Affidavit*, at 2. However, in her deposition Dr. Buchanan testified:

> Q. There's been an allegation that at the January 27th, 1994 visit, that you saw patients who were white patients ahead of Ms. Womack in an act of racial discrimination. Did that happen?
>
> A. I may have seen patients before Ms. Womack, but it wasn't -- it had nothing to do with race.
>
> Q. Tell us just very briefly how the clinic was set up as far as which patients you saw in what order back in January of '94?
>
> A. Okay. I think it was an -- if you come for an afternoon appointment, you're supposed to sign in. You can come between 1:00 and 3:00. Once you sign in, it's a first-come-first-serve.
>
> Either a social worker or a nurse or a medical student will come and pick up that name, pick up that chart, call the patient back, interview that patient. And depending on how much the patient has to say or how slow the interviewer is and how slow their write-up is, it may take fifteen minutes for this to happen, or it may take forty-five.
>
> And then when that person is through, they put the chart on a stack on the bottom, and I pick the charts off the top, whatever chart is on top, I take it, and I call that patient back.

16

> Q. When you pick the chart off the top, do you have any way of knowing at that point whether this is a black patient or white patient or of some other nationality?
>
> A. No. I just know its the top of a stack that had been put there by other people.

*Buchanan Deposition*, at 33-35. There is no evidence that Ms. Womack was made to wait on the basis of her race. Further still, there is no evidence that Dr. Buchanan had anything to do with the plaintiff's wait. Therefore, the plaintiff cannot establish a prima facie case of intentional discrimination against Dr. Buchanan as to any of her allegations. Dr. Buchanan is accordingly entitled to judgment as a matter of law.

### E.  Pamela McFerrin

Ms. McFerrin is accused of: 1) instigating the interdisciplinary evaluation of Ms. Womack on June 1, 1993; 2) writing on the plaintiff's records that she appeared to be exaggerating her symptoms; 3) advising the plaintiff that her diagnosis had been changed to malingering; 4) singling out and/or ridiculing the plaintiff; 5) angrily questioning the plaintiff about her pending lawsuits in group therapy; 6) failure to acknowledge and respond to grievances of the plaintiff; 7) failure to treat the plaintiff without regards to race, color, or creed; and 8) encouraging the plaintiff to leave the clinic by asking her why she was still a patient if her cases had been settled. *Amended Complaint*, at 6-8.

The only evidence that refers to Ms. McFerrin is the Affidavit of Ms. Estelle. In that affidavit, Ms. Estelle mentions that she "overheard" Ms. McFerrin's questioning of the plaintiff at her August 26, 1993, and October 21, 1993, appointments. She also testifies that Ms. McFerrin asked the plaintiff "why are you still coming here if your cases are over?"

*Estelle Affidavit*, at 15. However, there is no evidence that white patients at the clinic with the same types of problems were not asked the same types of questions in the same manner. There is simply no evidence that the plaintiff was discriminated against because she was asked about her prior litigation--much less that such discrimination was intentional. Ms. McFerrin testified:

> Q. Were you instructed by anyone else to question Ms. Womack in regards to her then ongoing litigations during her group therapy?
>
> A. Was I asked by someone to question her?
>
> Q. Uh-huh (positive response).
>
> A. No.
>
> Q. Is this type of questioning a general part of group therapy?
>
> A. For that particular situation, it was. I remember Ms. Womack being in group and being very anxious. I recall saying to her, as I do anyone in group, regardless of race, is -- you know, Do you understand about what's going on with your legal problems, simply trying to get to some of the anxiety-provoking feelings that could be discussed in group, not to find out the nature of any legal proceedings. It was more or less to get to the feelings of how she felt basically.

*McFerrin Deposition*, at 18-19. Ms. McFerrin is entitled to judgment as a matter of law.

## V. **Conclusion**

The plaintiff has failed to carry her burden of showing intentional discrimination on the part of the defendants. Accordingly, all of the defendants are entitled to judgment as a matter of law. By separate order, their motion for summary judgment will be granted and the plaintiff's case will be. The motion to strike will be adjudged moot.

Done, this _23rd_ of July, 1997.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE